SOUTHWESTERN BELL TELEPHONE COMPANY; Texas Statewide Telephone Cooperative, Inc.; and GTE Southwest, Incorporated, Appellants,

v.

PUBLIC UTILITY COMMISSION OF TEXAS; AT & T Communications of the Southwest, Inc.; MCI Telecommunications Corp.; Texaltel; Digital Direct of Dallas, Inc.; Sprint Communications Co., L.P.; Teleport Communications Group; MFS Communications Co., Inc.; Time Warner Entertainment Co., L.P.; and American Petroleum Institute, Appellees.

No. 3–93–552–CV.

Court of Appeals of Texas, Austin.

Dec. 7, 1994.

Rehearing Overruled Jan. 11, 1995.

Robert J. Hearon, Jr., Graves Dougherty Hearon & Moody, Austin, for Southwestern Bell Telephone Co.

Don R. Richards, McWhorter Cobb & Johnson, L.L.P., Lubbock, for Texas Statewide Telephone Co-op., Inc.

David C. Duggins, Clark Thomas & Winters, Austin, for GTE Southwest, Inc.

Dan Morales, Atty. Gen., Susan Bergen Schultz, Asst. Atty. Gen., Austin, for PUC.

Thomas Anson, Anson Maloney & Hill, L.L.P., Austin, for AT & T.

C. Douglas Jarrett, Keller & Heckman, Washington, D.C., for American Petroleum Institute.

Steve Bickerstaff, Bickerstaff Heath & Smiley, L.L.P., Austin, for Digital Direct of Dallas, TEXALTEL and Time Warner.

Before POWERS, ABOUSSIE and JONES, JJ.

## ON MOTION FOR REHEARING

JONES, Justice.

The opinion issued herein on September 21, 1994, is withdrawn, and the following opinion is filed in lieu thereof.

Southwestern Bell Telephone Company, appellant, filed suit against the Public Utility Commission ("the Commission"), appellee, pursuant to the Administrative Procedure Act ("APA"), Tex.Gov't Code Ann. § 2001.038 (West 1994),[1] seeking a declaratory judgment that two of the Commission's substantive rules were invalid. Several parties intervened in the suit, some as plaintiffs challenging the rules and some as defendants in support of the rules.[2] The district court rendered summary judgment for the Commission declaring that the rules were valid as adopted and as applied. On appeal, Southwestern Bell asserts that the trial court erred in granting the Commission's motion for summary judgment and in denying its own motion for summary judgment, because the rules (1) violate the Public Utility Regulatory Act ("PURA"), Tex.Rev.Civ.Stat.Ann. art. 1446c, §§ 1–120 (West Supp.1994); and (2) deny Southwestern Bell its constitutional rights to due process and equal protection of the laws. *See* Tex. Const. art. I, §§ 3, 19; U.S. Const. amend. XIV. We will reverse in part and affirm in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The Commission regulates all public utilities operating within the State of Texas. *See* PURA §§ 16, 50(1). The term "public utility" is defined to include anyone "owning or operating for compensation in this state equipment or facilities for ... the conveyance, transmission, or reception of communications over a telephone system *as a dominant carrier* as hereinafter defined." PURA § 3(c)(2)(A) (emphasis added).[3] Because a telecommunications company's status as a "public utility" depends on whether it is a "dominant carrier," PURA provides that

> "dominant carrier" when used in this Act means (i) a provider of any particular communication service which is provided in whole or in part over a telephone system who as to such service has sufficient market power in a telecommunications market as determined by the commission to enable such provider to control prices in a manner

1. All citations in this opinion are to the current APA rather than the former Administrative Procedure and Texas Register Act because the recent codification did not substantively change the law. Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 47, 1993 Tex.Gen.Laws 583, 986.

2. Parties who intervened as plaintiffs were GTE Southwest, Incorporated and Texas Statewide Telephone Cooperative, Inc. Along with Southwestern Bell, these parties are now appellants.

 Parties who intervened as defendants were AT & T Communications of the Southwest, Inc.; MCI Telecommunications Corp.; TEXALTEL (Texas Association of Long Distance Telephone Companies); Digital Direct of Dallas, Inc.; Sprint Communications Co., L.P.; Teleport Communications Group; MFS Communications Co., Inc.; Time Warner Entertainment Co., L.P.; and American Petroleum Institute. Along with the Commission, these parties are now appellees.

 For simplicity, we will refer to appellants collectively as "Southwestern Bell" and to appellees collectively as "the Commission."

3. Non-dominant telecommunications utilities may also be regulated by the Commission, but to a lesser extent. *See* PURA §§ 3(c)(2)(A), 18(c).

adverse to the public interest for such service in such market; and *(ii) any provider of local exchange telephone service within a certificated exchange area as to such service....* Any such provider determined to be a dominant carrier as to a particular telecommunications service in a market shall not be presumed to be a dominant carrier of a different telecommunications service in that market.

PURA § 3(c)(2)(B) (emphasis added).

PURA does not define "local exchange telephone service."[4] Since 1984 the Commission has defined the term in its substantive rule 23.61. Until 1992 rule 23.61 defined "local exchange service" as follows:

> Telecommunications service provided within service areas in accordance with the local exchange tariffs. It includes the use of exchange facilities required to establish connections between customer access lines within the exchange and between customer access lines and the long distance facilities serving the exchange.

9 Tex.Reg. 4276 (1984). In the late 1980s, however, it became apparent that not every activity falling within the literal definition of the term would be considered a local exchange service for regulatory purposes. As technology in the telecommunications industry advanced, an increasing number of so-called "competitive access providers" began offering services that were not considered by the Commission to be local exchange services, but which competed with local exchange services provided by local exchange companies. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d 918 (Tex. App.—Austin 1988, writ denied) (hereinafter *"Dobie Mall"*); *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 735 S.W.2d 663 (Tex. App.—Austin 1987, no writ). In 1992 the Commission amended its definition of "local exchange service" contained in subparagraph (a)(17)(A) of rule 23.61 to read as follows:

> Telecommunications service provided within an exchange for the purpose of establishing connections between customer premises within the exchange, including connections between a customer premises and a long distance service provider serving the exchange. Local exchange service may also be referred to as local exchange telephone service.[5]

17 Tex.Reg. 7884, 7894 (1992). More important than modifying this definition, however, the Commission also amended rule 23.61 by adding subparagraph (a)(17)(B), which specifically excluded nine categories of activities from the definition of "local exchange service."[6] This amendment grew directly out

---

4. PURA does, however, define "local exchange company" as "a telecommunications utility certificated to provide local exchange service within the state." PURA § 3(v).

5. We believe the new wording of amended rule 23.61(a)(17)(A) did not substantially alter the meaning of the previous rule, but was primarily a clarification. Moreover, although amended rule 23.61 is one of the two rules that Southwestern Bell challenges, subparagraph (a)(17)(A) of the rule is not part of the dispute.

6. As promulgated in 1992, subparagraph (a)(17)(B) of amended rule 23.61 provided:

(B) Notwithstanding subparagraph (A) of this paragraph, the following services are not local exchange service:

(i) services for which local exchange carriers have been granted authority to enter into customer-specific contracts pursuant to the Act [PURA], § 18(e)(3)(B), as those services are described in § 23.27 of this title (relating to Rate-Setting Flexibility for Services Subject to Significant Competitive Challenges);

(ii) services for which a local exchange carrier has been granted authority to engage in pricing flexibility pursuant to § 23.27 of this title;

(iii) private line services and virtual private line services;

(iv) resale or sharing of local exchange service, where that resale or sharing is allowed by commission approved tariffs;

(v) dark fiber services;

(vi) non-voice data transmission services;

(vii) dedicated and virtually dedicated access services;

(viii) any service initially provided within an exchange, after adoption of this rule, if first provided by an entity other than the local exchange carrier(s) certificated to provide service within that exchange; and

(ix) any service that the commission determines by final order in a docketed proceeding is not local exchange service.

17 Tex.Reg. at 7894.

Rule 23.61 was again amended in 1993 and 1994. 18 Tex.Reg. 3403 (1993); 19 Tex.Reg. 500 (1994). Because these amendments do not alter the meaning of the rule, we will refer to the 1992 version on which Southwestern Bell filed suit.

of legal issues raised in cases such as *Dobie Mall*.[7]

At the same time the Commission amended rule 23.61, it also adopted a rewritten version of substantive rule 23.27, which dealt with "rate-setting flexibility for services subject to significant competitive challenges." By way of background, in the early 1980s, with the breakup of AT & T imminent, the legislature apparently began preparing for a gradual deregulation of the telecommunications industry. In 1983 PURA was amended to provide:

> The legislature finds that the telecommunications industry through technical advancements, federal judicial and administrative actions, and the formulation of new telecommunications enterprises has become and will continue to be in many and growing areas a competitive industry which does not lend itself to traditional public utility regulatory rules, policies, and principles; and that therefore, the public interest requires that new rules, policies, and principles be formulated and applied to protect the public interest and to provide equal opportunity to all telecommunications utilities in a competitive marketplace.

PURA § 18(a). The legislature also amended section 18(c) of PURA to give the Commission limited jurisdiction over specialized common carriers, resellers of communications, and other communications carriers that are not dominant carriers. In 1987 the legislature added section 18(e) to PURA to give the Commission authority to adopt special rules and procedures to deal with growing competition in the area of local exchange services:

> For the purpose of carrying out the public policy stated in Subsection (a) of this section and any other section of this Act notwithstanding, the commission is granted all necessary power and authority under this Act to promulgate rules and establish procedures applicable to local exchange companies for determining the level of competition in specific telecommunications markets and submarkets and providing appropriate regulatory treatment to allow local exchange companies to respond to significant competitive challenges.

PURA § 18(e)(1). The Commission was simultaneously commanded to "promulgate these rules and establish these procedures so as to incorporate an appropriate mix of regulatory and market mechanisms reflecting the level and nature of competition in the marketplace." PURA § 18(g). The purpose of substantive rule 23.27 was to implement flexible regulatory procedures to enable local exchange companies to respond to the "significant competitive challenges" contemplated by section 18(e) of PURA.

Southwestern Bell and the Commission have a fundamental disagreement about the proper interpretation of the foregoing sections of PURA, particularly the portion of subsection 3(c)(2)(B) that defines "dominant carrier." Under the Commission's construction, a carrier who provides local exchange telephone service is automatically a dominant carrier not only as to the local exchange service it provides, but also as to all other services it provides. Under the Commission's interpretation, therefore, PURA requires full regulation of *all* services provided by a local exchange company, including services that do not constitute local exchange services. Southwestern Bell, on the other hand, asserts that a local exchange carrier is not automatically a dominant carrier as to its provision of services *other* than local exchange services merely by virtue of its being a provider of local exchange services. Thus, Southwestern Bell contends that PURA does not authorize full regulation of its services that do not constitute local exchange services without a determination of its market power to control prices as contemplated by subsection 3(c)(2)(B)(i).

The language of rules 23.61 and 23.27 themselves do not reflect the conflicting interpretations of PURA held by Southwestern Bell and the Commission. In its order

---

7. In its brief to this Court, the Commission gives the following basis for its adoption in 1992 of subparagraph (a)(17)(B) of rule 23.61: "In light of *Dobie Mall,* ... the Commission determined that the day had come to amend its rule to clarify which services do not constitute 'local exchange service.' "

adopting rule 23.61, however, the Commission made its intention clear: "[T]he commission's reading does not limit the dominance designation to a carrier's provision of local exchange service. Rather, the dominance designation attaches to the provider and, therefore, applies to all services of that provider." 17 Tex.Reg. at 7886. The order adopting rule 23.27 also refers to the Commission's interpretation of the disputed sections of PURA. 17 Tex.Reg. 7869, 7869–70. Southwestern Bell asserts that rules 23.27 and 23.61—or the Commission's threatened application of them—conflict with PURA and are, therefore, invalid.

## DISCUSSION

This Court recently restated the familiar principles that

"[A]n agency can adopt only such rules as are authorized by and consistent with its statutory authority." *Railroad Comm'n v. Lone Star Gas Co.,* 844 S.W.2d 679, 685 (Tex.1992) (quoting *State Bd. of Ins. v. Deffebach,* 631 S.W.2d 794, 798 (Tex.App.—Austin 1982, writ ref'd n.r.e.)). In this connection, it is well settled that an agency rule may not impose additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions.

*Railroad Comm'n v. ARCO Oil & Gas Co.,* 876 S.W.2d 473, 481 (Tex.App.—Austin 1994, writ requested); *see also City of El Paso v. Public Util. Comm'n,* 839 S.W.2d 895, 910 (Tex.App.—Austin 1992) ("[I]f there is no specific express authority for a challenged [agency] action, and if the action is inconsistent with a statutory provision or ascertainable legislative intent, we must conclude that, by performing the act, the agency has exceeded its grant of statutory authority."), *aff'd in part & rev'd in part,* 883 S.W.2d 179 (Tex.1994).

■ The cardinal rule of statutory construction is to ascertain and follow the legislature's intent. *Citizens Bank v. First State Bank,* 580 S.W.2d 344, 348 (Tex.1979); *Minton v. Frank,* 545 S.W.2d 442, 445 (Tex.1976). If possible, we ascertain that intent by looking at the language used in the statute. *Jones v. Del Andersen & Assocs.,* 539 S.W.2d

348, 350 (Tex.1976); *Railroad Comm'n v. Miller,* 434 S.W.2d 670, 672 (Tex.1968). The words in the statute should be interpreted according to their ordinary meaning; they are not to be interpreted in an exaggerated, forced, or strained manner. *Commissioners Court v. Criminal Dist. Attorney, Caldwell County,* 690 S.W.2d 932, 936 (Tex.App.—Austin 1985, writ ref'd n.r.e.). Every word of a statute is presumed to have been used for a purpose, and every word excluded must also be presumed to have been excluded for a purpose. *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981); *Barr v. Bernhard,* 562 S.W.2d 844, 849 (Tex.1978).

Both Southwestern Bell and the Commission argue that the grammatical structure of PURA § 3(c)(2)(B)(ii) and the placement of the phrase "as to such service" require the adoption of their own interpretation. Thus, the Commission contends that "as to such service" modifies "within a certificated exchange area," thereby making subsection (B)(ii) refer to an exchange area that has been "certificated as to local exchange telephone service." Southwestern Bell, on the other hand, contends that "as to such service" modifies "any provider of local exchange telephone service" and that the effect of section (B)(ii) must, therefore, be limited to local exchange service. We believe neither argument hits the mark.

■ We may not construe a statutory provision in isolation from the rest of the statute; rather, we must consider the act as a whole, and not just a single phrase, clause, or sentence thereof. *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985); *Cameron,* 618 S.W.2d at 540; *Barr,* 562 S.W.2d at 849. We will not give one provision a meaning out of harmony or inconsistent with other provisions, although that provision might be susceptible to such a construction if standing alone. *Barr,* 562 S.W.2d at 849; *Black v. American Bankers Ins. Co.,* 478 S.W.2d 434, 437 (Tex.1972).

In determining who is a "dominant carrier," subsections (B)(i) and (B)(ii) both focus on the nature and scope of the *service* provided. Thus, under subsection (B)(i) a provider of *any telecommunications service* as

to which the provider has sufficient market power to control prices in a manner adverse to the public interest is a dominant carrier. Although the subsection does not say so expressly, this logically means the provider is a dominant carrier *as to the service for which it has the requisite market power.* Likewise, under subsection (B)(ii) a provider of *local exchange service* is a dominant carrier. This logically means that a provider of local exchange service is a dominant carrier *as to the local exchange service it provides.* Thus, even if the Commission's interpretation of the phrase "as to such service" were correct (i.e., that it modifies only the immediately preceding phrase, "within a certificated exchange area") that would simply mean that subsection (B)(ii), like subsection (B)(i), does not expressly state the obvious.

If there were any doubt about the correctness of this construction, it would be erased by the following sentence contained in the same subsection: "Any such provider determined to be a dominant carrier as to a particular telecommunications service in a market shall not be presumed to be a dominant carrier of a different telecommunications service in that market." PURA § 3(c)(2)(B). We believe that both subsection (B)(i) and subsection (B)(ii) clearly encompass a procedure or definition for determining if a provider is a dominant carrier as to "a particular telecommunications service." The Commission's interpretation—that a provider of local exchange services is automatically a dominant carrier as to any other services it may provide, including non-local exchange services—flies directly in the face of the foregoing statutory provision.

The Commission argues, however, that the "shall not be presumed" provision applies only to subsection (B)(i), and not to subsection (B)(ii), because only under subsection (B)(i) is an actual "determination" of dominance made. We reject this view. In its own 1992 order adopting the amendments to rule 23.61, the Commission stated that "the

provision of local exchange service is one means by which a telecommunications utility is *determined* to be dominant." 17 Tex.Reg. at 7884 (emphasis added). The Commission gives us no compelling reason to reach the illogical result of applying the "shall not be presumed" provision to subsection (B)(i) but not to subsection (B)(ii).

 Finally, the Commission asserts in the alternative that subdivision (B)(ii) is ambiguous and that we should defer to the Commission's interpretation. *See Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993). However, such deference is permissible only if the meaning of the statutory language is unclear or ambiguous. *Id.; Citizens Nat'l Bank v. Calvert,* 527 S.W.2d 175, 180 (Tex.1975); *Meno v. Kitchens,* 873 S.W.2d 789, 791 (Tex.App.—Austin 1994, writ denied). We conclude that PURA § 3(c)(2)(B) is not ambiguous in any material respect and that the Commission's interpretation conflicts with the plain meaning of the provision. Accordingly, we decline to defer to the Commission's interpretation.[8]

 Having concluded that the meaning of the disputed statutory provision is clear and unambiguous, our inquiry is narrowed considerably. As this Court recently stated in *Kitchens,*

The plain-meaning rule is subject only to narrow exceptions. For example, we should not "attribute to the Legislature an intention to work an injustice." *State v. Mauritz–Wells Co.,* 141 Tex. 634, 175 S.W.2d 238, 242 (1943); *see also State Highway Dep't v. Gorham,* 139 Tex. 361, 162 S.W.2d 934, 936 (1942); *Alvarado v. Gonzales,* 552 S.W.2d 539, 542 (Tex.Civ. App.—Corpus Christi 1977, no writ). Nor should we construe a statute in a way that leads to foolish or absurd consequences. *Estate of Padilla v. Charter Oaks Fire Ins. Co.,* 843 S.W.2d 196, 199 (Tex.App.—Dallas 1992, writ denied); *Alvarado,* 552 S.W.2d at 542.... The mere fact that a policy

---

**8.** We do not address the extent of the Commission's discretion in determining if a particular telecommunications service constitutes a "local exchange service," whether provided by a local exchange company or a competitive access provider. We hold only that a provider of local

exchange services is not, merely by virtue of its provision of such services, automatically subject to full Commission regulation in its provision of other services that do not constitute local exchange services.

seems unwise or inconsistent with other policies does not justify a departure from the plain meaning of the legislative mandate. *See, e.g., Railroad Comm'n v. Miller,* 434 S.W.2d 670, 672 (Tex.1968).

873 S.W.2d at 792.

Nonetheless, the Commission also argues that Southwestern Bell's interpretation is inconsistent with section 18 of PURA. Chief among the Commission's arguments is that such a construction would render PURA § 18(e) meaningless. As noted above, section 18(e) grants the Commission authority "to promulgate rules and establish procedures *applicable to local exchange companies* for determining the level of competition in specific telecommunications markets and submarkets and providing appropriate regulatory treatment to allow local exchange companies to respond to significant competitive challenges." PURA § 18(e)(1) (emphasis added). The section goes on to provide a list of factors that the Commission shall consider in an evidentiary hearing to determine the level of competition in a market and to provide several regulatory treatments available to the Commission. PURA § 18(e)(2), (3).

From the foregoing, the Commission correctly argues that the purpose of section 18(e) can only be to provide relief to regulated providers who find themselves in competition with providers of unregulated services. Since providers of local exchange services are, by definition, dominant carriers and therefore regulated as to those services, the Commission correctly reasons that section 18(e) cannot have been enacted to "level the playing field" for two providers whose competition is in local exchange services, because in that instance both would be regulated and no leveling would be needed. Likewise, where both competing providers are unregulated, competitive market processes would presumably make relief for either one of them unnecessary.

The Commission incorrectly assumes, however, that competition between a regulated provider and an unregulated provider can exist only where (1) the *services* of both providers do not constitute local exchange services, and (2) as to one of the providers (the local exchange company), the non-local

exchange services are regulated anyway. From this incorrect assumption, the Commission reasons that the legislature must have intended for the Commission to fully regulate any non-local exchange services being provided by local exchange companies. We disagree.

The Commission overlooks the fact that advancing technology often allows newly developed services that do not constitute local exchange services to be *used by a customer in lieu of* traditional local exchange services. This allows direct competition between providers of regulated local exchange services and providers of unregulated non-local exchange services. One small example of such competition appeared in *Dobie Mall.* There, a small telecommunications company set up, without having obtained the certificate of convenience and necessity required of public utilities, a "switching system" within a privately owned building that housed residential, office, and commercial tenants. *Southwestern Bell,* 745 S.W.2d at 920. The certificated local exchange company for the area (which happened to be Southwestern Bell) challenged its right to do so, arguing that the switching system constituted local exchange service. Although the system provided by the smaller company clearly competed with the local exchange services provided by the local exchange company, the Commission concluded that the smaller company's system did not constitute "local exchange services." *Id.* at 924. This Court held that the Commission acted within its authority in so concluding. *Id.* at 926.

Thus, technological advances can produce direct competition between local exchange services and non-local exchange services. The Commission itself recognized this in its 1989 report, "Status of Competition in Long Distance and Local Telecommunications Markets in Texas":

The local exchange carriers continue to be dominant providers of basic telephone service. However, advances in technology, improvements and expansion of cellular or mobile telephone services, and changes in the regulation of the cable television industry may increase competition in this market in the future. Also, a limited amount

of direct competition exists in the form of shared tenant service providers.

It appears that the legislature also recognized the potential for this type of competition in its 1987 amendments to PURA § 18(e):

In determining the level of competition in a specific market or submarket, the commission shall hold an evidentiary hearing to consider the following:

(A) the number and size of *telecommunications utilities or other persons* providing the same, equivalent, or substitutable service;

(B) the extent to which the same, equivalent, or substitutable service is available;

(C) the ability of customers to obtain the same, equivalent, or substitutable services at comparable rates, terms, and conditions;

(D) the ability of *telecommunications utilities or other persons* to make the same, equivalent, or substitutable service readily available at comparable rates, terms, and conditions; . . . .

PURA § 18(e)(2) (emphasis added). Implicit in the foregoing provision is the recognition that "the same, equivalent, or substitutable services" can be provided not only by telecommunications utilities, but also by "other persons" who are *not* telecommunications utilities.

It is obvious, then, that an unregulated non-local exchange service can function similarly to, and compete directly with, a regulated local exchange service. In such a situation, the regulatory flexibility contemplated by PURA § 18(e), whether "pricing flexibility" or some other form of relief, might be essential to the ability of the regulated local exchange company to compete. Because we can envision at least one other set of circumstances in which flexible regulatory treatment could be useful in this context, we conclude that Southwestern Bell's interpretation of PURA § 3(c)(2)(B) does not render PURA § 18(e) meaningless. Accordingly, neither this argument nor the Commission's policy arguments founded on other provisions of section 18 of PURA show the plain meaning of subsection 3(c)(2)(B) to produce a result that is unjust, unreasonable, or absurd.

■■■■ We conclude that the Commission's threatened application of rules 23.61 and 23.27, as revealed in its orders adopting the rules, is inconsistent with PURA, which directs that, absent a determination of market dominance, local exchange companies are to be regulated as dominant carriers only as to their provision of local exchange services. It does not necessarily follow from this conclusion, however, that the rules themselves are invalid, in whole or in part. Indeed, as noted above, the actual language of the rules does not *require* that providers of local exchange services be regulated as dominant carriers for all services they provide.

■■■■ This Court has stated that the following standard should be used to determine whether a partially invalid agency rule should be severed, thus preserving the valid part:

If a part only is invalid, the severance decision depends on the court's determination of two issues: (1) will the function of the regulatory statute as a whole be impaired without the invalid part of the rule; and (2) is there any indication that the agency would not have adopted the rule but for the invalid part? If the answer to either query is "yes," in the court's view, then severance is not justified and the entire rule must fall.

*Texas Dep't of Banking v. Restland Funeral Home, Inc.,* 847 S.W.2d 680, 683 (Tex.App.—Austin 1993, no writ). We think a similar standard may be used for determining whether, and to what extent, an agency's erroneous construction of its enabling statute can render invalid an agency rule relying on that construction.

■■■■ Applying the foregoing standard to the present case, we have substantial doubt that, but for its misconstruction of PURA, the Commission would have adopted subparagraph (a)(17)(B) of rule 23.61 in the form that it did. *See supra* note 7. From the outset, the bulk of this whole controversy has revolved around the parties' conflicting interpretations of the legal consequences that would flow from these "exceptions" to the

definition of local exchange service. It appears to us that a significant part of the Commission's overall plan in adopting the exceptions in subparagraph (a)(17)(B) was the belief that the Commission's regulatory authority over local exchange companies would not be diminished. We conclude, therefore, that subparagraph (a)(17)(B) of rule 23.61 is so intertwined with the Commission's planned application of it that this portion of the rule cannot survive its illegitimate foundation.[9]

On the other hand, we do not find any indication that the Commission would not have adopted the remainder of rule 23.61 without its erroneous construction of PURA.[10] Indeed, it appears that virtually all of the remaining 1992 amendments to rule 23.61 are definitions having no bearing whatsoever on the substance of this dispute. Nor does it appear that the function of PURA or the remainder of rule 23.61 would be impaired without subparagraph (a)(17)(B).

Rule 23.27 was, as stated earlier, adopted to implement the legislative command in PURA § 18(e)(1) that the Commission "promulgate rules and establish procedures applicable to local exchange companies for determining the level of competition in specific telecommunications markets and submarkets and providing appropriate regulatory treatment to allow local exchange companies to respond to significant competitive challenges." As we have discussed above, rule 23.27 necessarily contemplates the situation in which a regulated service provided by a local exchange company is in competition with an unregulated service provided by a competitive access provider. Indeed, the rule is expressly designed to establish procedures whereby a local exchange company in such a competitive position can apply to the Commission for special regulatory treatment to enable it to meet such competition.

It is true that in promulgating rule 23.27, the Commission was of the mistaken opinion that *every* service provided by a local exchange company would be regulated. The result of our holding today is that some services provided by a local exchange company may not be regulated because they do not constitute local exchange services. Nevertheless, it is also true, as we noted earlier, that some regulated services provided by local exchange companies may face competitive challenges from unregulated services provided by competitive access providers. In PURA § 18(e), the legislature has specifically instructed the Commission to adopt rules and procedures for identifying and dealing with such situations. The fact that the Commission adopted those procedures in rule 23.27 under the mistaken impression that they would be needed more often than they will under our holding does not, in our view, create any doubt that the Commission would have adopted them. The procedures will still be needed in the same type of situation as that contemplated by the Commission. We find nothing in the record indicating that the Commission would not have adopted the procedures contained in rule 23.27 but for its erroneous interpretation of PURA.

In summary, we hold that the Commission's threatened application of rules 23.61 and 23.27, as discussed herein, is invalid. We further hold that there is substantial reason to believe the Commission would not have adopted subparagraphs (a)(17)(B) and (a)(17)(C) of rule 23.61 in their current form but for its erroneous interpretation of PURA. We also hold, however, that there is no reason to believe the Commission would not have adopted the remaining provisions of rule 23.61 and all of rule 23.27 but for its erroneous interpretation of PURA. Finally, we hold that subparagraphs (a)(17)(B) and (a)(17)(C) may properly be severed from the remainder of rule 23.61.

---

9. If nothing else, subparagraph (a)(17)(B) of rule 23.61 would likely fail the "reasoned justification" requirement of APA § 2001.033, because the Commission's order adopting the rule sought to justify that portion of the rule on an erroneous construction of PURA.

10. The only exception to this statement is subparagraph (a)(17)(C) of rule 23.61, which states: "(C) The provisions of subparagraph (B) of this paragraph shall be liberally construed to encourage a competitive marketplace." This part of the rule would obviously be meaningless without subparagraph (a)(17)(B).

We sustain Southwestern Bell's first point of error. Because of our disposition of this point, we do not address Southwestern Bell's second point of error.

## CONCLUSION

We reverse the portion of the trial court's judgment declaring valid the threatened application of rules 23.61 and 23.27 as discussed herein; we render judgment declaring that the Commission's threatened application is invalid. We further reverse that portion of the trial court's judgment declaring subparagraphs (a)(17)(B) and (a)(17)(C) of rule 23.61 valid as adopted, and we sever those subparagraphs from the rest of the rule; we render judgment declaring subparagraphs (a)(17)(B) and (a)(17)(C) of rule 23.61 invalid as adopted. We affirm the remainder of the trial court's judgment.